**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

_____

ELENA ANKHIMOVA and KONSTANTIN
GUREVICH,

              Plaintiffs,

v.                                        **CASE NO.:**

CARNIVAL CORPORATION, a Florida
Foreign Corporation, d/b/a CARNIVAL
CRUISE LINES; CARNIVAL
CORPORATION & PLC; COSTA CRUISE
LINES, INC., a Florida Corporation; and
COSTA CROCIERE, S.P.A., a Foreign
Corporation,

              Defendants.

_____

**COMPLAINT AND DEMAND FOR JURY TRIAL**

       Plaintiffs, ELENA ANKHIMOVA and KONSTANTIN GUREVICH (collectively referred to as "Plaintiffs") by and through their undersigned counsel, hereby bring this action against the Defendants, CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINES, CARNIVAL CORPORATION & PLC, COSTA CRUISE LINES, INC., and COSTA CROCIERE, S.P.A. (collectively referred to as "Defendants"), and allege as follows:

**INTRODUCTORY STATEMENT**

       1.    This lawsuit arises from the shipwreck of the M/S Costa Concordia ("Costa Concordia") off the coast of the Isola del Giglio, Italy on January 13, 2012. Plaintiffs are passengers on Costa Concordia who suffered injury and damage as a result of the shipwreck.

## JURISDICTION AND VENUE

2.      This is an action for damages which exceed $75,000, exclusive of interest, attorneys' fees and all taxable costs.

3.      This Court has personal jurisdiction over Defendants. Defendants are Florida corporations, engaged in business in the State of Florida, and/or maintain an office or agent in Florida. *See* Fed. R. Civ. P. 4(k)(1)(A); Fla. Sta. § 48.193.

4.      This Court has diversity of citizenship jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs are citizens of Russia and Defendants are Florida corporate citizens, and more than $75,000 is in controversy.

5.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because some of Plaintiffs' claims arise under the Death on the High Seas Act codified at 46 U.S.C. § 30302.

6.      That jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1333, which provides original jurisdiction to the United States District Court exclusive of state courts of "any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they may be entitled."

7.      Venue in this Court is appropriate. Defendants reside in the Southern District of Florida. *See*. 28 U.S.C. § 1391.

## PARTIES

8.      At all times material, Plaintiff, ELENA ANKHIMOVA, was a resident of Russia, was booked as a passenger on the Costa Concordia for travel beginning on January 13, 2012, and is *sui juris*.

9.      At all times material, Plaintiff, KONSTANTIN GUREVICH, was a resident of Russia, was booked as a passenger on the Costa Concordia for travel beginning on January 13, 2012, and is *sui juris*.

10.      Defendant, CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINES ("CARNIVAL"), is a Panamanian corporation and is registered as a Florida foreign corporation with its principal place of business in Miami-Dade County, Florida.

11.      Carnival Cruise Lines is a trademarked brand name known to the public as "Carnival".

12.      CARNIVAL conducts substantial and not isolated business in Miami-Dade County, Florida.

13.      Defendant, CARNIVAL CORPORATION & PLC, is a dually listed company with its headquarters and its principal place of business in both Southampton, England and Miami, Florida.

14.      CARNIVAL CORPORATION & PLC are separate legal entities, however, they jointly own and operate several cruise lines which include: Carnival Cruise Lines (23 ships); Princess Cruises (17 ships); Holland America Line (15 ships); COSTA CRUISE LINES, INC. (15 ships); P & O Cruises (7 ships); Cunard (3 ships); Seabourn (5 ships); AIDA (8 ships); P & O Cruises Australia (3 ships); Iberocruceros (4 ships); and Holland America Princess Alaska Tours (Tour Operation).

15.      In 2010, CARNIVAL companies reported 2010 revenues of nearly $15 billion, of which it is believed more than half comes from American passengers.

16.      The cruise industry has grown substantially in the United States, with CARNIVAL leading the pack.

3

17.     CARNIVAL operates from several U.S. ports, but has, for more than a decade, included Miami-Dade County as the venue of choice on all of its passenger tickets.

18.     Defendant, COSTA CRUISE LINES, INC. ("COSTA CRUISE"), is a Florida corporation with its principal place of business in Hollywood, Florida.

19.     Upon information and belief, COSTA CRUISE LINES is a wholly owned subsidiary of CARNIVAL CORPORATION & PLC.

20.     Defendant, COSTA CROCIERE, S.P.A. ("COSTA CROCIERE"), is an Italian corporation and, upon information and belief, is a wholly owned subsidiary of CARNIVAL. COSTA CROCIERE has applied for and received a certificate of authority from the Florida Department of State to transact business in the state.

21.     In addition to the heavy marketing and sales done from the United States, COSTA CROCIERE engages in business and maintains an office in Florida.

22.     Additionally, COSTA CROCIERE maintains a registered agent in Hollywood, Florida.

## FACTUAL ALLEGATIONS

23.     CARNIVAL is the largest and financially strongest cruise company and amongst the largest and most profitable vacation companies in the world.

24.     The CARNIVAL brand includes several cruise lines, including Defendant, COSTA CRUISE, which calls on approximately 250 ports around the world.

25.     CARNIVAL directly and/or indirectly through its agents or others undertakes to train and supervise the crew, including officers, in ship maneuvering, bridge resource management, ship stability, emergency preparedness and other maritime skills for all of its cruise

brands, including COSTA CRUISE, recognizing that the same is essential to the safety of passengers.

26.     At all times material, Defendants, CARNIVAL CORPORATION & PLC and CARNIVAL, exercise such a degree of control over Defendant, COSTA CRUISE that the acts of COSTA CRUISE are in fact the acts of CARNIVAL CORPORATION & PLC and CARNIVAL.

27.     At all times material, COSTA CRUISE and COSTA CROCIERE, act as agents for CARNIVAL CORPORATION & PLC and CARNIVAL and manifest no separate corporate interests of their own, functioning solely to achieve the purposes of CARNIVAL CORPORATION & PLC and CARNIVAL.

28.     At all times material, COSTA CRUISE was and is the alter-ego of CARNIVAL and CARNIVAL CORPORATION & PLC.

29.     Additionally, COSTA CRUISE is a subsidiary of its parent corporation, CARNIVAL.

30.     As further evidence of their relationship and agency, CARNIVAL and COSTA CRUISE share an interlocking Board of Directors, for example, Pier Luigi Foschi is a Director of CARNIVAL CORPORATION & PLC and Chairman of COSTA CRUISE.

31.     At all times material, Defendants share the same maritime policy and compliance officer. *See* CARNIVAL CORPORATION & PLC Press Release, January 19, 2012:

> Carnival Corporation & PLC and the cruise industry as a whole have maintained an excellent safety record over the years. "However, this tragedy has called into question our company's safety and emergency response procedures and practices," said Mickey Arison, chairman and CEO of Carnival Corporation & PLC. "While I have every confidence in the safety of our vessels and the professionalism of our crews, this review will evaluate all practices and procedures to make sure that this kind of accident never happens again."

> The review is being led by Captain James Hunn, a retired U.S. Navy Captain and currently the company's senior vice president of Maritime Policy & Compliance.

Following a 32-year career in the Navy, Hunn has held senior positions at Carnival Corporation & PLC for nearly a decade, focusing on corporate-wide efforts to establish maritime policy standards, while overseeing the company's health, environmental safety and security practices.

32.    Upon information and belief, Defendants, CARNIVAL CORPORATION & PLC and CARNIVAL, are responsible for training and hiring of staff across the various cruise brands that operate under the CARNIVAL empire.

33.    Upon information and belief, the Costa Concordia ship is owned and operated by one or more of the Defendants directly and/or through one of their subsidiaries or agents.

34.    Upon information and belief, the Costa Concordia ship is a COSTA CRUISE branded ship within the CARNIVAL fleet.

35.    The Costa Concordia is a 951-foot, 14-deck cruise ship. She has 1,500 cabins and the capacity for 3,780 passengers and 1,100 crew.

36.    On January 13, 2012 at approximately 7:00 p.m. local time, the Costa Concordia, departed out of Port Civitavechia, Italy in the Tyrrhenia Sea, carrying approximately 4,200 passengers inclusive of crew members, heading north to Savona, Italy.

37.    The Costa Concordia was to embark on its regular itinerary schedule which included stops in ports at Savona, Italy; Marseille, France; Barcelona, Spain; Palma de Mallorca, Cagliari and Palermo, Italy.

38.    On the aforementioned date at approximately 9:45 p.m. local time, the Costa Concordia struck the Le Scole Reef, a rocky outcrop just off the coast of Isola del Giglio, Italy. The collision tore a 160-foot gash in the ship's hull.

39.    The Le Scole Reef is a well-known natural structure that has appeared prominently in nautical charts of the area for hundreds of years. Because of the shallow water threat and possibility of collision, the area is a marked hazard and is outside of the approved route for large

vessels such as the Costa Concordia. The Costa Concordia was about 800-meters from shore at the time of collision.

40.     Maneuvering (or authorizing the maneuvering of) a 4,200 person cruise ship within a kilometer of shore in an area well-known to have dangerous reefs, colliding with those reefs, and tearing a 160 foot gash in her hull does not occur in the absence of reckless disregard for human life.

41.     Pier Luigi Foschi, a director of CARNIVAL, COSTA CRUISE and COSTA CROCIERE, stated that the Costa Concordia's Captain, Captain Francesco Schettino, had taken an unauthorized route too close to shore on January 13, 2012. But Captain Schettino claims that it was COSTA CRUISE's management that directed the route.

42.     Independent monitors revealed that on August 14, 2011, the Costa Concordia took an almost identical route along the coast of Giglio – a similarly dangerous and reckless route considering its proximity to the shore and known reefs. Pier Luigi Foschi has even admitted during this attempt to view a celebration, the ship was caused to run aground. This route was admittedly authorized by management.  Pier Luigi Foschi further admitted to the existence of an alarm system which sounded upon any deviation in the Costa Concordia's preprogrammed route.

43.     Approximately fifteen minutes after the collision with the Le Scole Reef, the Costa Concordia's engine room crew informed Captain Schettino that the hull was irreparably breached, that the generators and engines were submerged, and that "there was nothing to be done." At this point in time, Captain Schettino knew or should have known that the Costa Concordia would sink.

44.     Soon thereafter, the onboard lights began to flicker, the Costa Concordia began to list and passengers began to panic.

45.     The passengers, however, were not told of the collision or that the Costa Concordia was sinking. Despite a coded alarm to the crew indicating a breached hull, passengers were told, "please stay calm, everything is under control, it is just a minor technical fault."

46.     Upon information and belief, passengers onboard the sinking ship, in an effort to seek help, phoned relatives ashore. The Italian police were notified that there were issues aboard the Costa Concordia at approximately 10:00 p.m. The police then forwarded the pleas of passengers to the Italian coast guard. In response, the Italian coast guard contacted the Costa Concordia for a report on the situation but was not told of the collision or the gash in the hull.

47.     Around 10:05 p.m., Captain Schettino told the coast guard that: "It's all OK, it's just a blackout, we're taking care of the situation."

48.     Also around this same time, Captain Schettino informed Defendants of the situation. Pier Luigi Foschi would later state: "Normally, we evaluate the situation and if necessary give advice. This time we didn't get to give advice because of what the Captain said in his [10:05 p.m.] conversation didn't correspond to the truth."

49.     Therefore, Defendants knew or should have known around 10:05 p.m. that the integrity of the Costa Concordia was compromised and that the safety of her passengers was in jeopardy.

50.     At approximately 10:16 p.m., the Italian coast guard contacted the Costa Concordia again. It was at this time that Captain Schettino finally admitted that water was coming into the ship's hull. However, Captain Schettino maintained and represented to the coast guard that there was no emergency.

51.     One hour after the ship made contact with the Le Scole Reef, under pressure from the Italian coast guard, the Costa Concordia agreed to send a mayday signal. The Costa Concordia was then listing at 20 degrees.

52.     Although no order or direction to abandon ship was given, using their own common sense and human instinct for survival, passengers donned life vests and gathered by lifeboats; but the Costa Concordia's crew turned them away.

53.     As the Costa Concordia continued to sink, the ship's crew directed passengers trying to abandon ship to return to their cabins and that the "electrical problems" were under control.

54.     Finally, at approximately 10:50 p.m., and again under pressure from the Italian coast guard, Captain Schettino ordered the ship to be abandoned. However, by this time many of the lifeboats were inaccessible because of the Costa Concordia's ever-worsening list.

55.     Less than an hour later, the Captain and some of the senior crew boarded a lifeboat and abandoned the Costa Concordia with women, children and elderly passengers.

56.     The Costa Concordia's crew was unprepared to evacuate the ship with a significant list.

57.     Around 11:40 p.m., the Costa Concordia's Captain was seen ashore. He later informed the Italian coast guard that he was "coordinating the rescue."

58.     The stories told by passengers who survived the ordeal were ones of chaos, lies, and abandonment – the Costa Concordia's crew ignored her passengers, leaving only "chefs and waiters" to help them survive – passengers were forced to jump into freezing waters in an attempt to swim for shore.

59.     The events onboard the Costa Concordia could not have occurred in the absence of negligence or reckless disregard for human life. Every passenger on board could have been saved from injury and death had they been instructed to abandon ship immediately following the collision or had the passengers been allowed to follow their own instincts and board the lifeboats. Thirty-two people perished aboard the Costa Concordia that night.

60.     In response to the disaster, CARNIVAL hired outside experts to conduct an audit of the company's emergency response and safety procedures.

61.     Plaintiffs were on board the Costa Concordia at the time of the shipwreck and suffered injury and damage as a result of the actions of the Defendants.

62.     As a direct and proximate result of Defendants' actions, Plaintiff, ELENA ANKHIMOVA, was caused to suffer serious physical and permanent injuries to her knees, arms, wrists, hands, and face and emotional distress. Plaintiff, ELENA ANKHIMOVA, has undergone surgical repair to the damage caused to her leg. Plaintiff, KONSTANTIN GUREVICH, was caused to suffer serious and permanent emotional distress as a result of Defendants' actions.

## COUNT I
## NEGLIGENCE
## (AS AGAINST ALL DEFENDANTS)

63.     Plaintiffs readopt and reallege the allegations contained in paragraphs 1 through 62 as though fully set forth herein.

64.     Defendants, directly and/or by and through their agents and employees, as the owners and/or operators of the Costa Concordia, owed her passengers, including Plaintiffs, a duty to exercise reasonable care under the circumstances to avoid causing personal injury and death.

65.     Defendants breached this duty by:

        a.   failing to subject passengers to safety and evacuation drills;

b.  failing to prevent the Costa Concordia from steering an unsafe and reckless route off the coast of Giglio by approving of the route and similar routes in the past;

c.  failing to prevent the Costa Concordia's collision with the rocks off the coast of Giglio;

d.  failing to warn and notify the passengers of the collision and pending emergency in a timely fashion by lying and concealing the truth regarding the collision and imminent sinking;

e.  failing to warn the authorities and others in a position to aid the Costa Concordia of the collision and pending emergency in a timely fashion by failing to communicate the truth to the Italian coast guard; failing to order the ship abandoned in a timely fashion once it was apparent that the ship would sink; and

f.  failing to assist passengers in abandoning ship by preventing them from boarding lifeboats, lying to them about the need to evacuate, failing to properly operate emergency equipment onboard such as lifeboats, and failing to know how to evacuate the ship while listing.

66.  As a direct and proximate result of these breaches, Plaintiffs suffered personal injury, pain and suffering, emotional distress, property damage and economic and non-economic injury.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

## COUNT II
## NEGLIGENT RETENTION
## (AS AGAINST ALL DEFENDANTS)

67.     Plaintiffs readopt and reallege the allegations contained in paragraph 1 through 66 as though fully set forth herein.

68.     Defendants, directly and/or by and through their agents, were the employers of the Costa Concordia's crew, including her Captain, Captain Francesco Schettino, and/or had the authority to direct the employment of the Costa Concordia's crew, including Captain Schettino. Defendants had the ability to control the Costa Concordia's crew, including her Captain, such as to substantially reduce the probability of harm to other persons.

69.     Defendants had notice that the Costa Concordia's Captain had a propensity for recklessly maneuvering the Costa Concordia close to the shore and as such, knew or should have known that he would do so again in a manner dangerous to all aboard.

70.     That the Costa Concordia's Captain would have maneuvered the Costa Concordia in such a reckless manner again, was either known to Defendants or could have reasonably been anticipated by them and could have been prevented by the Defendants exercise of due diligence and authority over the Costa Concordia's Captain. Defendants failed to do so.

71.     Upon information and belief, Defendants had notice around 10:05 p.m. on the night of the shipwreck that the Costa Concordia had a gash in her hull and would sink, but that the Captain, recklessly, had not ordered the ship abandoned or informed the Italian coast guard which in all probability would greatly harm all aboard.

72.     That the Costa Concordia's Captain's reckless failure to act would continue as the Costa Concordia sank could reasonably have been anticipated by Defendants and could have been

prevented by Defendants exercise of due diligence and authority over the Costa Concordia's Captain that night. Defendants failed to do so.

73.     As a direct and proximate result of these breaches, Plaintiffs suffered personal injury, pain and suffering, emotional distress, property damage and economic and non-economic injury.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

**COUNT III**
**NEGLIGENT TRAINING**
**(AS AGAINST CARNIVAL)**

74.     Plaintiffs readopt and reallege the allegations contained in paragraphs 1 through 73 as though fully set forth herein.

75.     CARNIVAL, having undertaken to train and supervise the Costa Concordia's crew, negligently and carelessly failed to use reasonable care to fulfill this undertaking.

76.     This failure increased the risk of harm to the Costa Concordia's passengers and/or amounted to a breach of the undertaken duties owed by the owner and/or operator of the Costa Concordia to her passengers. The Costa Concordia's crew was utterly unprepared and untrained to properly handle a serious emergency, much less, the Costa Concordia Shipwreck. The Costa Concordia's crew did not conduct proper emergency drills with passengers, did not communicate the nature of the emergency to passengers, did not allow passengers to abandon ship to save their own lives, and did not know how to assist passengers in abandoning a listing ship.

13

77.     As a direct and proximate result of these breaches, Plaintiffs suffered personal injury, pain and suffering, emotional distress, property damage and economic and non-economic injury.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

**COUNT IV**
**GROSS NEGLIGENCE**
**(AS AGAINST ALL DEFENDANTS)**

78.     Plaintiffs readopt and reallege the allegations contained in paragraphs 1 through 77 as though fully set forth herein.

79.     At all times material, Defendants owned, operated and or maintained the Costa Concordia.

80.     At all times material Defendants had a duty to Plaintiffs to maintain and operate the Costa Concordia so as to not create hazardous and life threatening conditions.

81.     At all times, Defendants breached that duty by creating hazardous and life threatening conditions.

82.     At all times material, Defendants had a duty to Plaintiffs to respond to any life threatening situation, including any situation created by Defendants, by following proper procedures and regulations, in a quick and expedited manner to ensure the safety and well-being of the passengers, and to minimize injury.

83.     Defendants acted in a severely reckless and willful, wanton manner, with complete disregard for the safety, lives and well-being of the Plaintiffs, demonstrating an extreme departure from reasonable care coupled with a conscious awareness of the risk of harm, and thus breached their duties to the Plaintiffs in every regard by:

a.  choosing not to conduct a safety drill on January 9, 2012, when the ship left port in Barcelona, Spain;

b.  choosing not to investigate the noise created by the scraping on the Le Scole Reef and the immediate subsequent listing of the vessel;

c.  choosing not to alert the crew to investigate the noise or the reason for the listing of the vessel;

d.  failing to properly train their crew to respond to act to save lives in the absence of action or direction from the Captain when it was obvious the ship was listing and sinking;

e.  failing to properly train their crew to use emergency equipment and lifeboats;

f.  failing to properly train their crew to complete an emergency task once it has begun;

g.  failing to warn the passengers;

h.  failing to ascertain the true nature of the ship's condition  and precipitously and improperly directing the ship to be grounded. Such actions without proper or reasonable foundation led to a dangerous condition thereby complicating the evacuation procedures;

i.  failing to take action to officially prepare for an evacuation until approximately 11:00 p.m., one hour and fifteen minutes after the vessel scraped the Le Scole Reef, leaving a 160-foot gash in the port side of the hull;

     j.   abandoning the ship before all passengers were evacuated and accounted for;

     k.   failing to take an accounting of, and assist passengers in any way once they reached the shore of Giglio Island.

84.    As a result of Defendants' gross negligence, Plaintiffs were stranded at sea in a sinking ship without communication or direction from the Captain or crew, and had to fend for themselves.

85.    Defendants gross negligence directly contributed to the deaths of thirty-two (32) travelers and ensuing terror for those who survived.

86.    Plaintiffs were in terror of catastrophic injury, death, drowning, having been placed in a situation where common sense said the vessel was sinking but the orders from the crew were to return to their cabins.

87.    As a direct and proximate result of Defendants' breach, Plaintiffs have suffered and will continue to suffer severe discomfort, injuries and sickness, severe mental anguish, pain, loss of enjoyment of life, aggravation of any previously existing conditions, lost wages, and loss of wage earning capacity.

88.    Defendants, CARNIVAL and CARNIVAL CORPORATION & PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE. Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL CORPORATION & PLC.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity

for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

### COUNT V
### MARITIME NEGLIGENCE
### (AS AGAINST ALL DEFENDANTS)

89.     Plaintiffs readopt and reallege the allegations contained in paragraphs 1 through 88 as though fully set forth herein.

90.     At all times material, Defendants owned, operated, managed, maintained and/or controlled the vessel, Costa Concordia.

91.     At all times material, Defendants had exclusive custody and control of the vessel and its crew.

92.     At all times material, Defendants had a duty to understand the navigational charts for the planned course the vessel would take, and to have knowledge of any potential reefs, nature preserves, sand bars or other potential undersea hazards that may be within close vicinity of the planned course.

93.     At all times material, defendants had a duty to know of any potential undersea hazards surrounding a land mass the vessel may sail past, including knowing how close is a safe distance to pass.

94.     At all times material hereto, Defendants had a duty to comply with all United States and International regulations and procedures regarding health, safety & security of all passengers on the Costa Concordia.

95.     At all times material hereto, Defendants had a duty to exercise safety and security and evacuation procedures in a timely manner. Upon information and belief, according to United

17

States standards, from the moment the Captain gave the signal to abandon ship, the crew should have loaded and launched the lifeboats within 30 minutes.

96.     At all times material hereto, Defendants had a duty to train the Costa Concordia Captain and senior officers to remain on the ship until all of the passengers were safely evacuated.

97.     At all times material hereto, Defendants knew or should have known, that the hull of the Costa Concordia could not withstand a scrape against a reef.

98.     At all times material hereto, Defendants knew or should have known, that the Costa Concordia did not have a sufficient safety system that would sound an alarm that would alert crew and passengers of an emergency situation, such as a 160-foot gash in the hull of the vessel and that it was taking on water.

99.     The *International Convention for the Safety of Life at Sea* adopted after the sinking of the Titanic, states that there should have been an emergency drill within 24 hours of the start of the ship's voyage. At all material times, Defendants knew or should have known that the Defendants had not conducted a safety drill since departing Barcelona on January 9, 2012.

100.     At all material times hereto, Defendants knew or should have known that they had not trained a large portion of crew members on safety and evacuation procedures, or to use safety and evacuation equipment.

101.     At all material times hereto, the Defendants knew or should have known that a large portion of the crew did not speak Italian, French, German, Spanish or English to a degree where they could communicate with the passengers or other crew.

102.     At all times material hereto, Defendants knew or should have known the risks of sailing a ten-story cruise ship too close to a coastal reef.

103.    Moreover, Defendants knew or should have known that the Costa Concordia had sailed too close to the shoreline on previous occasions, a practice known as a "sail-by-salute". COSTA CROCIERE has acknowledged previously giving Captain Schettino permission to skirt the coast of Giglio.

104.    Defendants knew or should have known that the Captain of the Costa Concordia did do sail-by-salutes. Captain Schettino reportedly told prosecutors, "It was planned, we were supposed to have done it a week earlier but it was not possible because of bad weather. They insisted. They said: 'We do tourist navigation, we have to be seen, get publicity and greet the island.'"

105.    It was the duty of Defendants to provide Plaintiffs with comfortable accommodations and to exercise reasonable care and effort to avoid subjecting the passengers to suffering or inconvenience. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1334 (11th Cir. 1984).

106.    The Defendants breached that duty when Captain Schettino failed to maintain control of the vessel and sailed the Costa Concordia too close to the Le Scole Reef, scraping the vessel against the reef, causing a massive hole in the port side.

107.    The massive hole in the side of the ship created an emergency situation and a reasonable duty of care would have been for the Captain and crew to immediately follow safety and evacuation procedures.

108.    Plaintiffs found themselves in a listing, capsizing, sinking vessel without communication, direction or help from the Captain and misdirection from the crew from approximately 9:45 p.m. to 11:00 p.m., and were left to fend for themselves.

109.   Plaintiffs allege that the Defendants' acts and omissions were caused by the joint negligence and fault of Defendants and/or their agents, servants, and/or employees which includes, without limitation the following:

a.   Defendants failed to properly inspect and conduct safety training and drills on the Costa Concordia to assure that its equipment was working and crew were properly trained on all safety and evacuation procedures;

b.   Defendants failed to promulgate, implement, and enforce procedures pertaining to the safe operation of the Costa Concordia which, if they had been so promulgated, implemented and enforced, would have averted the grounding and sinking;

c.   Defendants failed to properly operate the Costa Concordia and acted in a careless, reckless, and negligent manner without due regard for the safety of others when the Captain steered the vessel too close to the coast;

d.   Defendants failed to take appropriate action to avoid scraping the Le Scole Reef;

e.   Defendants failed to act, failed to alert passengers, and failed to timely implement proper evacuation procedures after the ship scraped the Le Scole Reef and began to list to the port side;

f.   The Captain failed to ascertain the true nature of the ship's condition and precipitously and improperly directing the ship to be grounded. Such actions without proper or reasonable foundation led to a dangerous condition thereby complicating the evacuation procedures;

g.   Defendants failed to warn passengers that it had scraped the Le Scole Reef causing a 160-foot hole on the port side of the ship, and that it was taking on water;

20

h.  When the Captain finally gave the order to abandon ship, the Defendants failed to implement policies and procedures to safely conduct an evacuation of the ship;

i.  Defendants failed to release lifeboats in a timely manner before the ship began to list and thereby made it impossible to release the lifeboats;

j.  Defendants negligently purchased and utilized a vessel that could not release its lifeboat if the vessel began to list a common occurrence in sinking vessels;

k.  Defendants negligently purchased and utilized a vessel that was not properly designed to compartmentalize breaches to the hull and thereby remain afloat even after a significant breach;

l.  Defendants' Captain and crew negligently evacuated the ship before all passengers had left the vessel a breach of long standing maritime tradition and law, and did not return the vessel even after being ordered by the Italian coast guard, which further endangered passengers who remained on board while the ship sank;

m.  Defendants engaged in such other acts of negligence and omissions as will be shown at the trial of this matter;

110.  As a direct and proximate result of Defendants' negligence, Plaintiffs were stranded at sea in a sinking ship without any communication or direction from the Captain or crew, and had to fend for themselves.

111.  The Defendants' negligence directly contributed to the deaths of approximately 32 people and the ensuing terror for those who survived.

112.  Plaintiffs were in terror of catastrophic injury, death, drowning, having been placed in a situation where common sense said the vessel was sinking but the orders from the crew were to return to their cabins.

113.     As a direct and proximate result of Defendants' breach, Plaintiffs have suffered and will continue to suffer severe discomfort, injuries and sickness, severe mental anguish, pain, loss of enjoyment of life, aggravation of any previously existing conditions, lost wages, and loss of wage earning capacity.

114.     Defendants, CARNIVAL and CARNIVAL CORPORATION & PLC are vicariously liable for the conduct of their subsidiary, COSTA CRUISE. Furthermore, COSTA CRUISE is liable for the conduct of its parent corporations, CARNIVAL and CARNIVAL CORPORATION & PLC.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AS AGAINST ALL DEFENDANTS)

115.     Plaintiffs readopt and reallege the allegations contained in paragraphs 1 through 114 as though fully set forth herein.

116.     Defendants' gross negligence in operating the ship, failure to warn passengers of the Defendants'-created emergency situation, Defendants' failure to act—to begin proper safety and evacuation procedures—for at least an hour, and the Captain's abandonment of ship, as well as crew members abandoning emergency evacuation tasks while in progress was intentional and reckless conduct.

117.    Such conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.

118.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered severe emotional distress, and have been and will be greatly inconvenienced in their ability to lead and enjoy a normal life, have lost and will continue loss substantial income, and have lost personal property.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

**COUNT VII**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(AS AGAINST ALL DEFENDANTS)**

119.    Plaintiffs readopt and reallege the allegations contained in paragraphs 1 through 118 as though fully set forth herein.

120.    All Defendants, and each of them, knew or reasonably should have known that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiffs.

121.    At all relevant times, all Defendants, and each of them, had the power, ability, authority, and duty to stop engaging in the conduct described herein and/or to intervene to prevent or prohibit said conduct.  Despite said knowledge, power, and duty, Defendants negligently failed to act so as to stop engaging in the conduct described herein and/or to prevent or prohibit such conduct or otherwise protect Plaintiffs.  To the extent that said negligent conduct was perpetrated by certain Defendants, the remaining Defendants confirmed and ratified said conduct with the

knowledge that Plaintiffs' emotional and physical distress would thereby increase, and with a wanton and reckless disregard for the deleterious consequences to Plaintiffs.

122.    Such conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.

123.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered severe emotional distress, and have been and will be greatly inconvenienced in their ability to lead and enjoy a normal life, have lost and will continue loss substantial income, and have lost personal property.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

## COUNT VIII
## LOSS OF SERVICES ON BEHALF OF PLAINTIFF KONSTANTIN GUREVICH (AS AGAINST ALL DEFENDANTS)

124.    Plaintiffs readopt and reallege the allegations contained in paragraphs 1 through 123 as though fully set forth herein.

125.    That at all times hereinafter mentioned, Plaintiff, KONSTANTIN GUREVICH, was the lawful spouse of the Plaintiff, ELENA ANKHIMOVA, and as such Plaintiff, KONSTANTIN GUREVICH, is entitled to the society, services and consortium of the Plaintiff, ELENA ANKHIMOVA.

126.    By reason of the negligence afore-described Defendants, Plaintiff, KONSTANTIN GUREVICH, was deprived of society, services and consortium of the Plaintiff, ELENA ANKHIMOVA, and shall forever be deprived of society, services and consortium.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

### COUNT IX
### LOSS OF SERVICES ON BEHALF OF PLAINTIFF ELENA ANKHIMOVA
### (AS AGAINST ALL DEFENDANTS)

127.    Plaintiffs readopt and reallege the allegations contained in paragraphs 1 through 126 as though fully set forth herein.

128.    That at all times hereinafter mentioned, Plaintiff, ELENA ANKHIMOVA, was the lawful spouse of the Plaintiff, KONSTANTIN GUREVICH, and as such Plaintiff, ELENA ANKHIMOVA, is entitled to the society, services and consortium of the Plaintiff, KONSTANTIN GUREVICH.

129.    By reason of the negligence afore-described Defendants, Plaintiff, ELENA ANKHIMOVA, was deprived of society, services and consortium of the Plaintiff, KONSTANTIN GUREVICH, and shall forever be deprived of society, services and consortium.

WHEREFORE, Plaintiffs demand judgment against Defendants, in amounts in excess of the jurisdictional limits of this Court, including but not limited to bodily injuries, pain and suffering, disability, disfigurement and scarring, mental anguish, emotional distress, lost capacity

for the enjoyment of life, loss of income, medical and hospital expenses, loss of bodily functions, and property damage and any further relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

a.     Damages in an amount to be determined at trial;

b.     Pre-judgment and post-judgment interest at the maximum rate allowable at law;

c.     Equitable, injunctive, and declaratory relief;

d.     Treble, exemplary, and/or punitive damages in an amount to be determined at trial;

e.     The costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees;

f.     All statutory damages;

g.     Such other and further relief under all applicable state and federal law and any other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:  January 11, 2013

> By:     /s/ Jordan L. Chaikin_____
> Jordan L. Chaikin
> Florida Bar Number 0878421
> **PARKER WAICHMAN LLP**
> 3301 Bonita Beach Road, Suite 101
> Bonita Springs, Florida 34134
> Telephone:  (239) 390-8609
> Facsimile:  (239) 390-0055
> jchaikin@yourlawyer.com
>
> Raymond C. Silverman
> **PARKER WAICHMAN LLP**
> 6 Harbor Park Drive

26

Port Washington, New York 11050
Telephone: (516) 723-4611
Facsimile: (516) 723-4711
rsilverman@yourlawyer.com

*Attorneys for Plaintiffs*